Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL (II)

| OFICINA DE ÉTICA GUBERNAMENTAL<br><br>Recurrido<br><br>v.<br><br>RICKY LÓPEZ MARTIZ<br><br>Recurrente | KLRA202400037 | *Revisión* procedente de la Oficina de Ética Gubernamental<br><br>Caso Núm.<br>22-13<br><br>Sobre:<br>Violación a los incisos (b), (r) y (s) del Art. 4.2 de la Ley Orgánica de la Oficina de Ética Gubernamental de PR, Ley 1-2012, según enmendada |

Panel integrado por su presidente el Juez Bermúdez Torres, el Juez Adames Soto y la Juez Aldebol Mora

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de noviembre de 2024.

**I.**

El 30 de julio de 2021 la Oficina de Ética Gubernamental (OEG), presentó *Querella* contra el Sr. Ricky López Martiz imputándole haber violado los incisos (b), (r) y (s) del Art. 4.2 de la Ley Núm. 1 de 3 de enero de 2012, según enmendada, conocida como la *Ley Orgánica de la Oficina de Ética Gubernamental* (LOOEG).[1] El 17 de agosto de 2021 el señor López Martiz, mediante *Moción Solicitando la Desestimación de la Querella y/o en la*

---

[1] 31 LPRA § 1857a. En primer lugar, alegan que mientras el señor López Martiz era director de la Región Noroeste del Departamento de Recreación y Deportes (DRD), le dio instrucciones al Auxiliar de Sistemas de Oficina I, quien se encargaba de realizar las recaudaciones, que no depositara el dinero en efectivo que había recaudado y que se lo entregara a él. Esto, según surge de una auditoría interna del DRD al Centro de Capacitación Deportiva y Recreativa (CECADER). Alegó la OEG que parte de ese dinero fue utilizado en materiales de oficina, limpieza, suministros y equipos de jardinería y que había una deficiencia de dinero que no había sido depositado en la cuenta correspondiente.

En segundo lugar, plantearon que el señor López Martiz le ordenó al Auxiliar de Sistemas de Oficina I a no cobrar el arrendamiento de apartamentos, salón de actividades, ni el uso de la piscina del CECADER, ya que él había realizado acuerdos colaborativos para el uso gratuito de la piscina a cambio de productos de limpieza. Apéndice II del *Recurso de Revisión Judicial* del Recurrente, págs. 43-49.

*alternativa Contestación a la Querella,* pidió la desestimación de la *Querella* por no haber sido notificada adecuadamente y contestó algunas de las alegaciones. El 24 de agosto de 2021,[2] la OEG declaró No Ha Lugar la solicitud de desestimación y ordenó al señor López Martiz a contestar las alegaciones de la *Querella* que no había contestado.

Culminados los incidentes procesales de rigor, el Oficial Examinador concluyó en su *Informe* emitido el 10 de noviembre de 2023, que el señor López Martiz incurrió en una violación a los incisos (b) y (r) del Art. 4.2 de la Ley Núm. 1-2012 por los actos de la segunda situación planteada en la *Querella.* Recomendó, que se le impusiera multa y la restitución del dinero que omitió cobrar. Respecto a las imputaciones relacionadas a la primera situación y a la violación del inciso (s) del Art. 4.2 de la Ley Núm. 1-2012, recomendó su archivo.

Así las cosas, el 29 de noviembre de 2023, notificada el 30, la OEG acogió las recomendaciones del *Informe del Oficial Examinador* Oficial y emitió *Resolución* de conformidad. Por trasgredir los incisos (b) y (r) del Art. 4.2 de la LOOEG, le impuso multa de $4,000 más restitución de $2,920, según dispone el Art. 4.7 (c) de la LOOEG. En desacuerdo, el 20 de diciembre de 2023, el señor López Martiz presentó *Moción de Reconsideración.*[3] Sostuvo que no hubo prueba robusta, clara ni convincente para demostrar las violaciones imputadas y que, además, había actuado de buena fe y de conformidad a los acuerdos colaborativos del CECADER.

Denegada la reconsideración el 27 de diciembre de 2023,[4] el 26 de enero de 2024 el señor López Martiz presentó ante nos *Recurso de Revisión Judicial.* Plantea:

---

[2] Notificada el 25 de agosto de 2021. Apéndice IV del *Recurso de Revisión Judicial* del Recurrente, pág. 54.
[3] Apéndice X del *Recurso de Revisión Judicial* del Recurrente, págs. 89-93.
[4] Apéndice XI del *Recurso de Revisión Judicial* del Recurrente, págs. 94-96.

**Primer Error:**
ERRÓ Y ACTUÓ ARBITRARIA [E] IRRAZONABLEMENTE LA OFICINA DE ÉTICA GUBERNAMENTAL AL EMITIR UNA RESOLUCIÓN, POSTERIOR A LOS SEIS (6) MESES QUE DISPONE LA LPAU Y LOS NOVENTA (90) D[Í]AS DE CELEBRADA LA AUDIENCIA. LO ANTECEDENTE, SIN PREVIAMENTE DEMOSTRAR JUSTA CAUSA Y/O CIRCUNST[AN]CIAS EXCEPCIONALES PARA ELLO.

**Segundo Error:**
ERRÓ LA OFICINA DE ÉTICA GUBERNAMENTAL AL CONCLUIR QUE LA PARTE RECURRENTE COMETIÓ LAS VIOLACIONES ÉTICAS DESCRITAS EN LOS INCISOS (B) Y (R) DEL ART. 4.2 DE LA LEY DE LA OFICINA DE ÉTICA GUBERNAMENTAL. LO ANTERIOR, SE FUNDAMENTA CON LA AUSENCIA DE PRUEBA CLARA, ROBUSTA Y CONVINCENTE.

**Tercer Error:**
ERRÓ LA OFICINA DE ÉTICA GUBERNAMENTAL AL NO BASAR SU DETERMINACIÓN EN EVIDENCIA SUSTANCIAL QUE SURJA DEL EXPEDIENTE ADMINISTRATIVO.

**Cuarto Error:**
ERRÓ EN DERECHO Y EN LA APRECIACIÓN DE LA PRUEBA LA OFICINA DE ÉTICA GUBERNAMENTAL AL CONCLUIR QUE LA PARTE RECURRENTE COMETIÓ LAS VIOLACIONES ÉTICAS DESCRITAS EN LOS INCISOS (B) Y (R) DEL ART. 4.2 DE LA LEY DE LA OFICINA DE ÉTICA GUBERNAMENTAL.

El 22 de abril de 2024 la OEG y el señor López Martiz elevaron la transcripción de la prueba oral ofrecida en la audiencia. Por su parte, el 17 de mayo de 2024, la OEG presentó *Alegato en Oposición.* Con el beneficio de la comparecencia de las partes, la reproducción de la prueba oral, el Derecho y jurisprudencia aplicable, estamos en posición de resolver.

II.

En su primer señalamiento, el señor López Martiz aduce que OEG actuó arbitraria e irrazonablemente al emitir su *Resolución* pasados los seis (6) meses que dispone la *Ley de Procedimiento Administrativo Uniforme* (LPAU)[5] y los noventa (90) días de celebrada la audiencia, sin demostrar justa causa y/o circunstancias excepcionales para la demora. En contraste, la OEG sostiene que el

---

[5] 3 LPRA § 9601 *et seq.*

término de la sección 3.13 (g) de la LPAU,[6] es directivo y no jurisdiccional. Veamos.

A.

La sección 3.13 (g) de la LPAU dispone que: "[t]odo caso sometido a un procedimiento adjudicativo ante una agencia deberá ser resuelto dentro de un término de seis (6) meses, desde su radicación, salvo circunstancias excepcionales".[7] El propósito del mencionado plazo es asegurar que los procesos administrativos se lleven a cabo de manera rápida y eficiente, y así evitar que las agencias y sus directores incurran en tardanzas o dilaciones injustificadas.[8]

Por su parte, la sección 3.14 de la LPAU,[9] exige que la resolución final de la agencia se emita por escrito dentro de noventa (90) días después de concluida la vista o después de la presentación de las propuestas determinaciones de hechos y conclusiones de derecho, a menos que este término sea renunciado o ampliado con el consentimiento escrito de todas las partes o por causa justificada. Por tanto, dicho término, al igual que el término de seis (6) meses, dispuesto en la precitada sección 3.13 (g) de la LPAU, no es jurisdiccional.[10] Como términos directivos, pudieran ser prorrogados.[11]

En ocasión de pronunciarse sobre este articulado, en *UPR Aguadilla* v. *Lorenzo Hernández*,[12] el Tribunal Supremo indicó que:

> Esas secciones disponen un término de seis (6) meses para resolver el procedimiento adjudicativo ante las agencias y otro término de noventa (90) días para

---

[6] 3 LPRA § 9653(g).

[7] *Id.*; Véase: *Lab. Inst. Med. Ava.* v. *Lab. C. Borinquen*, 149 DPR 121, 136 (1999); *J. Exam. Tec. Méd.* v. *Elías et al.*, 144 DPR 483, 494-495 (1997).

[8] *Lab. Inst. Med. Ava.* v. 149 DPR, págs. 135-136.

[9] Dispone:
Una orden o resolución final deberá ser emitida por escrito dentro de noventa (90) días después de concluida la vista o después de la presentación de las propuestas determinaciones de hechos y conclusiones de derecho, a menos que este término sea renunciado o ampliado con el consentimiento escrito de todas las partes o por causa justificada. [...] 3 LPRA § 9654.

[10] *J. Exam. Tec. Méd.* v. 144 DPR, págs. 494-495.

[11] *Id.*

[12] *UPR Aguadilla* v. *Lorenzo Hernández*, 184 DPR 1001, 1009-1010 (2012).

emitir una resolución final después de concluida la vista o presentadas las determinaciones de hechos y conclusiones de derecho.

A estos efectos, la Asamblea Legislativa impuso a las agencias la obligación de adjudicar todo caso dentro de los términos señalados. Hemos señalado que ambos términos son **directivos** y no jurisdiccionales. Sin embargo, la ampliación de los términos sólo ocurre en las circunstancias dispuestas en la Ley Núm. 170, *supra*, "a saber, circunstancias excepcionales, consentimiento escrito de todas las partes, o causa justificada". Ante el incumplimiento de una agencia con su deber de decidir expeditamente, la parte afectada tiene disponible como remedios "la presentación de un *mandamus* ante el foro judicial o una moción de desestimación ante la agencia concernida". (Énfasis suplido y citas omitidas).[13]

B.

Ciertamente, la *Resolución* disponiendo de la controversia se emitió pasados los seis (6) meses desde la radicación de la *Querella*. No obstante, del expediente surgen circunstancias que justifican haberse apartado del fiel cumplimiento de dicho término. El alto volumen de prueba documental y testifical, unido a las varias peticiones de prórrogas del señor López Martiz para poder cumplir con las órdenes emitidas por el Oficial Examinador de la OEG justifican el que la *Resolución* se emitiera fuera de los seis (6) meses que se tenía para ello.[14]

Aun cuando le atribuyamos a la Agencia recurrida algún grado de dejadez, el Tribunal Supremo ha reiterado que el remedio judicial disponible cuando existe una dilación indebida en los

---

[13] *UPR Aguadilla* v. 184 DPR, págs. 1009-1010.
[14] Estas fueron algunas de las incidencias procesales:
El 26 de octubre de 2021, el Oficial Examinador de la OEG emitió una *Orden*, notificada ese mismo día, en la que concedió a las partes hasta el 30 de noviembre de 2021 para presentar el informe de conferencia con antelación a la audiencia. El 30 de noviembre de 2021, el representante legal del señor López Martiz presentó una *Moción en solicitud de término adicional para confección de informe de conferencia con antelación a la vista administrativa* en la que solicitó al Oficial Examinador treinta (30) días para presentar dicho informe ya que había estado tres semanas fuera de Puerto Rico por un asunto familiar. El Oficial Examinador, mediante *Orden* de 1 de diciembre de 2021 y notificada al día siguiente, le concedió el término solicitado. El 28 de diciembre de 2021, el señor López Martiz presentó otra *Moción en solicitud de término adicional para confección de informe de conferencia con antelación a la vista administrativa.* En esa ocasión, su solicitud se basó en el cierre de su oficina por dos semanas por razones de Covid-19 y debido a que estaría fuera de Puerto Rico hasta el 9 de enero de 2022. Mediante *Orden* de 29 de diciembre de 2021, el Oficial Examinador le concedió hasta el 4 de febrero de 2022 para cumplir con la *Orden* de 26 de octubre de 2021.

procesos adjudicativos administrativos es la presentación de un recurso de *mandamus* que obligue a la Agencia a cumplir con su responsabilidad.[15] El señor López Martiz nunca ejerció el derecho de obtener remedio por dicha vía. En conclusión, el primer error no fue cometido.

### III.

En sus señalamientos de error segundo, tercero y cuarto, el señor López Martiz cuestiona la corrección de la determinación recurrida. Específicamente, ataca la conclusión de que cometió las violaciones éticas imputadas a base de prueba que no fue clara, robusta ni convincente. Añade que el expediente administrativo carece de evidencia sustancial que sostenga dicha conclusión. Finalmente, ataca la apreciación de la prueba hecha por el juzgador. Veamos la validez de sus planteamientos.

### A.

La *Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico* fue creada con el objetivo principal de renovar y reafirmar la función preventiva y fiscalizadora de la OEG para atender los retos de un servicio público íntegro, en el cual los intereses personales de los servidores no sustituyan los intereses de la ciudadanía.[16] Cónsono con ello, la OEG y su Dirección Ejecutiva ostentan, entre sus facultades y poderes, promover y formular políticas de conducta de ética y moral dirigidas a conseguir el compromiso por parte de los empleados gubernamentales para que los intereses personales de éstos no sustituyan los intereses públicos.[17]

---

[15] *Rivera Sierra* v. *Supte. Anexo 500 Guayama*, 179 DPR 98, 151 (2010).

[16] Exposición de motivos de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, Ley Núm. 1-2012, (2012 [Parte 1] Leyes de Puerto Rico 18).

[17] 3 LPRA § 1855b(a)(2); Véase, además: *OEG* v. *Santiago Guzmán*, 188 DPR 215 (2013); *OEG* v. *Concepción Bonilla*, 183 DPR 695, 699 (2011); *OEG* v. *Rodríguez*, 159 DPR 98, 122 (2003).

La LOOEG establece un Código de Ética que reglamenta la conducta de los servidores y exservidores públicos de la Rama Ejecutiva. En él se reafirma, como principio cardinal, el alto interés público en proscribir las acciones improcedentes que ponen en riesgo la estabilidad del soporte moral del Estado.[18] Por lo tanto, se pretende que los servidores públicos antepongan el interés público a cualquier interés o motivación personal.

El Art. 4.2 de la LOOEG[19] establece las prohibiciones éticas de carácter general que rigen la conducta de los servidores públicos. "Su aspiración es establecer unas normas de carácter general para guiar la conducta de los funcionarios públicos".[20] En lo aquí pertinente, los incisos (b) y (r) del Art. 4.2, *supra*, establecen lo siguiente:

> (b) Un servidor público no puede utilizar los deberes y las facultades de su cargo ni la propiedad o los fondos públicos para obtener, directa o indirectamente, para él o para una persona privada o negocio, cualquier beneficio que no esté permitido por ley.
>
> . . . .
>
> (r) Un servidor público no puede omitir el cumplimiento de un deber impuesto por ley o reglamento, si con ello ocasiona la pérdida de fondos públicos o produce daño a la propiedad pública.

Para que se configure una infracción al inciso (b) de este Art. 4.2 deben coincidir los siguientes elementos: 1) que se trate de un servidor público; 2) que haya utilizado los deberes y facultades de su cargo, propiedad o fondos públicos; 3) con el fin de proporcionarse para sí mismo, a una persona privada o negocio; 4) cualquier beneficio que no esté permitido por ley.[21] Según el Art. 1.2 (i) de la LOOEG constituye "beneficio": "cualquier provecho, utilidad, lucro o ganancia, sin limitar el término a una ganancia pecuniaria

---

[18] 2012 LPR 18 (Expo. mts.).
[19] 3 LPRA § 1857a.
[20] *OEG* v. *Cordero Santiago*, 154 DPR 827, 845 (2001).
[21] *OEG* v. *Rodríguez,* 159 DPR 98 (2003).

o material, sino que denota cualquier forma de ventaja".[22] Para procesar a un servidor público por concederle a un tercero un beneficio no permitido por ley, solo basta que no exista ley que permita el beneficio de que se trate. Además, no es necesario que el funcionario logre el beneficio económico. Basta con que haya "la intención de obtener estos beneficios, aunque sus planes se vieron frustrados [...]".[23]

Por su parte, el inciso (r) del Art. 4.2 de la LOOEG establece que "[u]n servidor público no puede omitir el cumplimiento de un deber impuesto por ley o reglamento, si con ello ocasiona la pérdida de fondos públicos o produce daño a la propiedad pública".[24] Esta conducta cometida mediante omisión impropia o de resultado, se configura cuando el servidor público omite cumplir con un deber impuesto por ley o reglamento y tal omisión ocasiona la pérdida de fondos públicos o produce daños a la propiedad pública.

Existen varias disposiciones legales y reglamentarias que inciden en las actuaciones que originan la presente controversia. La Ley Núm. 8-2004, según enmendada, conocida como la *Ley Orgánica del Departamento de Recreación y Deportes*, establece que, como parte de su política pública, el Departamento de Recreación y Deportes (DRD) deberá "asumir una función activa en el mantenimiento y mejora de instalaciones de recreación y deportes y en la planificación y construcción de las nuevas que deban existir en función de la programación existente y futura".[25] El Art. 6 del mismo estatuto dispone que el Secretario del DRD tiene la facultad de delegar, en subalternos, las funciones que la Ley le confiere, excepto las de nombrar personal, aprobar, enmendar o derogar

---

[22] 3 LPRA § 1854.
[23] *O.E.G.* v. *Román*, 159 DPR 401, 413 (2003).
[24] 3 LPRA § 1857a.
[25] 3 LPRA § 444 nota.

reglamentos, otorgar escrituras y aprobar el presupuesto de gastos.[26]

Por su parte, las disposiciones del *Reglamento para el Arrendamiento de las Instalaciones y Terrenos del Departamento de Recreación y Deportes*[27] (Reglamento), cuyo propósito es establecer y regular el arrendamiento de propiedades del DRD, son de cumplimiento estricto y cualquier violación al mismo será causa suficiente para exigir las responsabilidades que correspondan sin perjuicio de cualquier otra responsabilidad civil o penal que las leyes establezcan.[28] Entre las clases de actividades que se pueden realizar en dichas propiedades, el capítulo IV del aludido Reglamento incluye, actividades deportivas y recreativas, de asociaciones o corporaciones sin fines de lucro, privadas y gubernamentales.[29] El siguiente capítulo describe el proceso que debe realizarse para el arrendamiento de dichas instalaciones. Su Art. 5.00 dispone:

> Toda solicitud de arrendamiento de instalaciones será presentada por escrito ante el Administrador de la instalación o del Director Regional en ausencia del primero con treinta (30) días de anticipación a la fecha de inicio de la actividad. (1) Todo solicitante deberá completar el formulario titulado "Solicitud de Uso". Toda solicitud deberá contener toda la información requerida en el formulario. (2) Dicho formulario completado y autorizado por el Administrador o el

---

[26] 3 LPRA § 444c; En ese contexto, el Secretario del DRD puede concertar convenios, acuerdos o contratos con agencias, municipios, instituciones privadas o individuos. Además, el Secretario puede adquirir, administrar y disponer de propiedad mueble o inmueble; recibir, otorgar, regular y fiscalizar becas u otros donativos o beneficios; cobrar por el acceso o uso de sus recursos o instalaciones, programas, servicios, información o asesoría, la concesión de licencias, certificaciones, autorizaciones, permisos y la entrada a eventos o actividades del DRD; *Véase* el Art. 7 de la Ley Núm. 8-2004, que establece que el DRD "podrá imponer y cobrar derechos y cargos por la concesión de licencias, permisos, certificados, autorizaciones, endosos o acreditaciones y la prestación de servicios a municipios, agencias y personas privadas, incluyendo a comités, federaciones, asociaciones deportivas y recreativas, previa aprobación de la reglamentación correspondiente".
    En relación a la propiedad inmueble, el Art. 11 dispone, que el Secretario podrá "[a]rrendar, ceder el usufructo o la administración de cualquier instalación recreativa o deportiva, propiedad del [DRD] o del Estado Libre Asociado de Puerto Rico bajo su jurisdicción, para uso recreativo o deportivo, a otras agencias, municipios, agencias del Gobierno Federal de los Estados Unidos u organizaciones recreativas privadas". 3 LPRA § 444g.
[27] Depto. Rec., *Reglamento para el Arrendamiento de las Instalaciones y Terrenos del Departamento de Recreación y Deportes*, Núm. 7358 (16 de mayo de 2007).
[28] Depto. Rec., Núm. 7358 art. 8.00.
[29] *Id.*

Director Regional servirán de factura para que el Recaudador reciba el pago establecido en la solicitud.
(3) El Recaudador emitirá un recibo de pago que el solicitante entregará al Administrador o Director Regional.[30]

Igualmente, atinente a la controversia ante nos, la Ley Núm. 159-1999, según enmendada, conocida como la *Ley para autorizar el Uso Gratuito de las Instalaciones Recreativas Gubernamentales a los Concilios de Puerto Rico de los "Boys Scouts" o "Girls Scouts of America"*,[31] autoriza, en términos generales, a que los "*Boy Scouts of America*" y las "*Girl Scouts of America*" usen gratuitamente las instalaciones pertenecientes al Gobierno de Puerto Rico. Establece:

Para disponer que toda instalación perteneciente al Gobierno de Puerto Rico o cualesquiera de sus agencias o dependencias, se prestará libre del pago de tarifas por cualquier concepto cuando la misma sea solicitada para llevar a cabo cualquier actividad del Programa Oficial auspiciado por los concilios de Puerto Rico, de los "Boy Scouts of America" o las "Girl Scouts of America", excluyéndose aquellas facilidades de alojamiento que generen ingresos a las agencias o dependencias gubernamentales. No obstante, se dispone que no se cobrará tarifa alguna por el uso de las áreas de acampar, según estas son definidas o designadas por las leyes y reglamentos aplicables.

---

[30] *Id.* art. 5.00; *Véase* el Art. 5.04 del mismo Reglamento que detalla los documentos que deben presentarse para autorizar el uso de las instalaciones del DRD según el tipo de actividad. Entre estos se encuentran la solicitud de uso, pago de arrendamiento y la fianza, seguros por daños a la vida y propiedad, compromiso de normas de uso y relevo de responsabilidad.

Por su parte, el Art. 6.00 del capítulo VI provee la forma en que se establece el canon de arrendamiento y la fianza para cada instalación del DRD. Según este, se tomarán en consideración varios factores como el tamaño de la instalación, terreno o habitaciones a utilizarse; el estimado de asistencia a la instalación el uso de equipos de la instalación (ej. luces, equipo deportivo, mesas, sillas, etc.); y el tipo de organización, asociación o corporación que hace la solicitud (ej. con o sin fines de lucro). Mientras el Art. 6.01 versa sobre las tarifas y las fianzas aplicables, el Art. 6.02 dispone, en síntesis, que la persona que solicita el uso de las instalaciones del DRD pagará la cantidad fijada al Recaudador de la siguiente forma: 10% del total al separar la fechas y la cuantía total y la fianza 15 días antes de la actividad.

El Art. 7.00 de dicha reglamentación establece que el administrador o, en ausencia de este, el Director Regional son los responsables de exigir, en todo momento, el cumplimiento del Reglamento a todo usuario, la entrega de todos los documentos requeridos y el precio a cobrarse con canon de arrendamiento y fianza, entre otras. De otra parte, el Art. 9.00 del Reglamento dispone que el Administrador o al Director Regional podrán autorizar actividades libre de costo si la entidad organizadora cumple con los siguientes requisitos: 1) Práctica o competencia deportiva que sea parte de actividades federadas o clubes o ligas reconocidas por el Departamento, 2) La práctica o competencia deberá formar parte de un calendario anual que otorgará la federación, club o liga al Departamento, 3) Sólo se eximirá de pago aquellas prácticas o competencias que estén incluidas en este calendario anual. A su vez, el Secretario del DRD se reserva el derecho a ceder instalaciones libres de costo mediante una autorización por escrito y donde exponga el fin público que se adelanta.

[31] 15 LPRA § 565 *et seq.*

B.

Precisa en este punto repasar el estándar probatorio con el que tiene que cumplirse para probar una violación al LOOEG. Según el Tribunal Supremo en *OEG* v. *Martínez Giraud*, 210 DPR 79 (2022), "se requiere satisfacer un estándar probatorio claro, robusto y convincente, de manera tal, que produzca en el juzgador una convicción permanente de que los asuntos fácticos son altamente probables".[32] De este modo, el cargo ético debe quedar establecido por prueba clara, robusta y convincente no afectada por reglas de exclusión, y ni a base de conjeturas.[33] Definió prueba clara, robusta y convincente como "aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables".[34]

En cuanto al alcance o las limitaciones de nuestra facultad de revisar las determinaciones de las agencias, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), Núm. 38-2017, según enmendada,[35] dispone que consiste, esencialmente, en determinar si la actuación de la agencia fue dictada dentro de las facultades que le fueron conferidas por ley y si la misma es legal y razonable.[36] Al respecto, es norma de derecho claramente establecida que los tribunales apelativos han de conceder gran deferencia y consideraciones a las decisiones de los organismos administrativos en vista de la vasta experiencia y conocimiento especializado.[37] Por lo tanto, los tribunales deben ser cautelosos al intervenir con las decisiones administrativas.[38]

---

[32] Véase, además: *In re Vissepó Vázquez*, 196 DPR 560 (2016); *In re Martínez Almodóvar*, 180 DPR 805, 820 (2011).

[33] *OEG* v. *Martínez Giraud*, 210 DPR 79, 93-94 (2022).

[34] *In re Ramos Mercado*, 165 DPR 630 (2005); *In re Soto Charraire*, 186 DPR 1019, 1028 (2012).

[35] 3 LPRA § 9601 *et seq.*

[36] *T-JAC* v. *Caguas Centrum*, 148 DPR 70 (1999).

[37] *Mun. de San Juan* v. *Plaza Las Américas*, 169 DPR 310, 323 (2006); *Hernández Álvarez* v. *Centro Unido*, 168 DPR 592, 615–616 (2006).

[38] *Metropolitana, SE* v. *ARPE*, 138 DPR 200, 213 (1995); *Viajes Gallardo* v. *Clavell*, 131 DPR 275, 289–290 (1992).

Es por estas razones que, como principio axiomático, las decisiones de los foros administrativos están investidos de una presunción de regularidad y corrección.[39] La presunción de corrección que acarrea una decisión administrativa, deberá sostenerse por los tribunales a menos que la misma logre ser derrotada mediante la identificación de evidencia en contrario que obre en el expediente administrativo.[40] Ello, debido a que los tribunales deben dar deferencia a las determinaciones de las agencias sobre asuntos que se encuentren dentro del área de especialidad de éstas.[41]

Asimismo, al momento de revisar una decisión administrativa el criterio rector para los tribunales será la razonabilidad en la actuación de la agencia.[42] Hay que determinar si la agencia actuó arbitrariamente o ilegalmente, o de manera tan irrazonable que su actuación constituyó un abuso de discreción.[43] Utilizando un criterio de razonabilidad y deferencia, los tribunales no deben intervenir o alterar las determinaciones de hechos de un organismo administrativo "si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad".[44]

A estos fines, se ha definido evidencia sustancial como "aquella [evidencia] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión".[45] Para establecer la alegación de ausencia de tal evidencia sustancial, la

---

[39] *García* v. *Cruz Auto Corp.*, 173 DPR 870 (2008); *Vélez* v. *ARPE*, 167 DPR 684 (2006); *Rivera Concepción* v. *ARPE*, 152 DPR 116, 123 (2000).
[40] *ELA* v. *PMC*, 163 DPR 478 (2004); *Misión Ind. P.R.* v. *Junta de Planificación*, 146 DPR 64, 130 (1998); *ARPE* v. *Junta de Apelaciones Sobre Construcciones y Lotificaciones*, 124 DPR 858 (1989).
[41] *Rivera Concepción* v. 152 DPR, pág. 123; *Fac. C. Soc. Aplicadas, Inc.* v. *CES*, 133 DPR 521 (1993).
[42] *Rebollo Vda. de Liceaga* v. *Yiyi Motors, Motor Ambar, Inc.*, 161 DPR 69 (2004).
[43] *Asociación de Vecinos Tulip/Monteverde, Inc.* v. *Junta de Planificación*, 171 DPR 863 (2007); *Marina Costa Azul* v. *Comisión,* 170 DPR 847 (2007).
[44] *Otero Mercado* v. *Toyota de PR Corp.*, 163 DPR 716 (2005); *Domingo Talavera* v. *Caguas Expressway Motors, Inc.*, 148 DPR 387 (1999).
[45] *Ramírez* v. *Depto. de Salud*, 147 DPR 901, 905 (1999).

parte afectada debe demostrar que existe "otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial [...] hasta el punto que se demuestre claramente que la decisión [de la agencia] no está justificada por una evaluación justa del peso de la prueba".[46]

En otras palabras, la parte recurrente viene obligada a derrotar la presunción de corrección de los procesos y de las decisiones administrativas.[47] Para lograr ese objetivo, tiene que demostrar que existe otra prueba en el récord que menoscabe el valor probatorio de la evidencia impugnada. Si la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hechos de una agencia deben ser sostenidas por el tribunal revisor.[48]

Ahora bien, cuando se trate de conclusiones de derecho que no involucren interpretaciones efectuadas dentro del ámbito de especialización de la agencia, éstas serán revisables por los tribunales sin circunscribirse al razonamiento que haya hecho la agencia.[49] Cuando se trate de la revisión de determinaciones que estén entremezcladas con conclusiones de derecho, el foro judicial tendrá amplia facultad de revisión, como si se tratara de una cuestión de derecho propiamente.[50]

IV.

Considerando el marco jurídico expuesto, examinemos si en efecto se logró probar las violaciones a los incisos (b) y (r) del Art. 4.2 de la LOOEG,[51] según le fueron imputadas al señor López Martiz. En síntesis, las imputaciones consistieron en que el señor

---

[46] *Metropolitana SE* v. *ARPE*, 138 DPR 200, 213 (1995).
[47] *Fac. C. Soc. Aplicadas, Inc.* v. 133 DPR, pág. 532.
[48] *Ramírez* v. 147 DPR, pág. 905.
[49] *Rivera* v. *A & C Development Corp.*, 144 DPR 450 (1997).
[50] *Id.*, pág. 461.
[51] 3 LPRA § 1857a.

López Martiz no cobró a varias personas la totalidad de los cánones de fianza, el arrendamiento de apartamentos, del salón de actividades ni el uso de la piscina del CECADER. Según la *Querella*, ello provocó la pérdida de dinero al erario y concedió un beneficio indebido a las personas que arrendaron apartamentos o las instalaciones del CECADER al no pagar o al pagar por debajo del precio por el uso de estos.

En la *Resolución* recurrida, la OEG adoptó en su totalidad el *Informe* sometido por el Oficial Examinador, donde se formularon las siguientes determinaciones de hechos:

### A. Determinaciones de hecho generales[52]

1. En algún momento antes del 2017, el querellado supervisó a la señora Lassalle López en el balneario de Añasco, propiedad del DRD, por espacio de cuatro años. Durante ese periodo, la señora Lassalle López fue la secretaria del querellado.[53]

2. El CECADER está ubicado en la base Ramey en Aguadilla. Es una de las facilidades que componen la región noroeste del DRD.[54]

3. El CECADER cuenta con apartamentos, salones de actividades, piscinas y otras facilidades disponibles para el uso del público en general.[55]

4. Había algunos apartamentos del CECADER que estaban deteriorados al punto de que no estaban en condiciones para ser alquilados. Sin embargo, las habitaciones que estaban aptas para su uso se estaban rentando.[56]

5. En el CECADER había habitaciones regulares que acomodaban hasta 8 personas y habitaciones "VIP", en las que cabían 6 personas. Las habitaciones regulares se arrendaban a un costo de $40.00 la noche, mientras que las habitaciones "VIP" costaban $60.00 la noche.[57]

6. Antes del 2017, mientras el Sr. William Balaguer ocupó el puesto de director regional de la Región Noroeste del DRD, éste le delegó a la señora Hernández Varela la función de recibir el dinero que pagaban las personas por el uso de las facilidades del CECADER.[58]

---

[52] Esta nota al calce hasta la 108 -siguiendo el orden numérico del presente recurso- corresponden a las del *Informe del Oficial Examinador*, las cuales fueron acogidas por la *Resolución* recurrida.
[53] Testimonio de la señora Lassalle López.
[54] Hecho estipulado entre las partes. Inciso *5* del acápite III del *Informe de conferencia.*
[55] *Id.* Inciso 6 del acápite III del *Informe de conferencia.*
[56] Testimonios del señor Rivera Pedraza y la señora Rivera Rosario.
[57] Testimonios de la señora Hernández Varela y del señor Toledo Rosa; *Exhibit* 7 de las partes, Minuta C-I: *Visita a la Región Noroeste (CECADER).*
[58] Testimonio de la señora Hernández Varela.

7. Antes del 2017, la Sra. Ivette González, recaudadora del DRD, estaba en Añasco, por lo que un chofer le llevaba el dinero recogido por la señora Hernández Varela en el CECADER con alguna frecuencia. La señora González recibía el dinero y preparaba un recibo oficial. Dicho recibo era recogido en Añasco por la persona que había pagado en el CECADER.[59]

8. Antes del 2017, no se hacían descuentos en el canon de arrendamiento de las habitaciones del CECADER.[60]

9. El señor López Martiz ocupó el puesto de director regional de la Región Noroeste del DRD desde el 3 de febrero de 2017 hasta el 8 de junio 2021.[61]

10. El concepto de la clase de director regional del DRD es la siguiente:

> Trabajo ejecutivo de gran complejidad y responsabilidad relacionado con la dirección de las actividades y programas que se realizan en una Oficina Regional del Departamento. Participa activamente en la formulación e implantación de la política pública de su área de responsabilidad y recomienda procedimientos para mejorar las actividades y servicios de los proyectos que dirige. El trabajo conlleva planificar, dirigir, coordinar, supervisar y evaluar las actividades y proyectos a nivel regional en el Departamento. Asesora al (a la) Secretario(a) sobre aspectos operacionales de los programas que dirige.

> Trabaja bajo la supervisión general del (de la) Secretario(a), quien le imparte instrucciones generales sobre los objetivos que se persiguen. Ejerce alto grado de juicio y criterio propio en el desempeño de sus funciones. Su trabajo se revisa mediante informes, reuniones y por la evaluación de los resultados obtenidos.[62]

11. El puesto de director regional del DRD ejerce, pero sin limitarse, los siguientes ejemplos de trabajo:

- Dirige, coordina, planifica y supervisa las actividades administrativas, operacionales y técnicas asignadas la Oficina Regional bajo su responsabilidad.
- Participa en la formulación e implantación de la política pública relacionada al área de los proyectos de la región asignada.
- Actúa en representación oficial del(de la) Secretario(a) en actividades relacionadas con la región asignada.
- Establece los planes de trabajo a seguirse para las diferentes actividades que se desarrollan en la región asignada.

---

[59] *Id.*
[60] *Id.*
[61] Hecho estipulado entre las partes. Véase el inciso 1 del acápite III del *Informe de conferencia.*
[62] *Exhibit* 2 de las partes.

- Supervisa, coordina y evalúa el trabajo de los empleados de la región asignada.
- Diseña, adapta y aplica sistemas y procedimientos para evaluar el desarrollo de los programas en la región asignada.
- Asegura el cumplimiento de los procedimientos que rigen los servicios que presta la región asignada.
- Realiza visitas de campo para supervisar las actividades que se realizan en los programas del Departamento y mantiene un registro de las mismas.
- Redacta correspondencia relacionada con su trabajo.
- Realiza estudios dirigidos a determinar la mejor utilización de los recursos disponibles en la región que dirige para viabilizar y mantener un desarrollo normal de las diferentes actividades de trabajo.
- Rinde informes, según se le requieran.[63]

12. Durante la incumbencia del querellado como director regional de la Región Noroeste, este supervisaba, coordinaba y evaluaba el trabajo de los empleados de dicha región del DRD.[64]

13. El señor López Martiz supervisaba directamente a los empleados adscritos al CECADER durante su incumbencia como director regional en el DRD.[65]

14. Cuando el querellado fue nombrado al puesto de director regional en 2017, la señora Hernández Varela fue reubicada de oficina y se le asignó trabajar con la asistencia y las requisiciones. En la oficina administrativa se quedó trabajando la señora Lassalle López.[66]

15. Entre los empleados adscritos al CECADER que estaban bajo la supervisión del querellado como director regional de la Región Noroeste del DRD, se encontraba la señora Lassalle López.[67]

16. El querellado, con conocimiento y aprobación del entonces secretario del DRD, señor Volmar Méndez, tenía la intención de mantener y reparar las facilidades del CECADER.[68]

17. El entonces secretario del DRD, señor Volmar Méndez, asignó a la señora Rivera Rosario para que inspeccionara el CECADER y para que colaborara con el señor López Martiz para mantener y reparar las facilidades del CECADER.[69]

---

[63] *Id.*

[64] Hecho estipulado entre las partes. Inciso 2 del acápite III del *Informe de conferencia.* Refiérase, además, al *Exhibit* 2 de las partes.

[65] Hecho estipulado entre las partes. Inciso 3 del acápite III del *Informe de conferencia.*

[66] Testimonio de la señora Hernández Varela.

[67] Hecho estipulado entre las partes. Inciso 4 del acápite III del *Informe de conferencia.*

[68] Testimonio de la señora Rivera Rosario, corroborado por el señor Volmar Méndez en el turno de refutación.

[69] *Id.*

18. Después del paso del huracán María por Puerto Rico, algunas habitaciones del CECADER quedaron destrozadas. No obstante, subsistieron habitaciones en buen estado que se podían utilizar.[70]

19. En enero de 2018, la Sra. Adriana Sánchez Parés comenzó a fungir como secretaria del DRD.[71]

20. El 3 de agosto de 2018, el señor Toledo Rosa, entonces auditor del DRD, visitó el CECADER con el propósito de realizar un arqueo de caja de los fondos recaudados por el recaudador auxiliar y realizar una monitoría de los procesos de recaudación hechos por la Unidad de Recaudaciones asignada a dicha instalación.[72]

21. En la visita del 3 de agosto de 2018 al CECADER, el señor Toledo Rosa entrevistó al Sr. Víctor Mercado Ortiz, auxiliar administrativo I, a la señora Lassalle López y a la Sra. Omayra Hernández Párela, auxiliar de sistemas de oficina III.[73]

22. El 3 de agosto de 2018, a las 11:51 am, la señora Lassalle López y el señor Toledo Rosa realizaron un arqueo de caja. La señora Lassalle López certificó que tenía en su poder treinta y nueve centavos ($0.39) que había recaudado en su capacidad oficial.[74]

23. Durante el periodo auditado no había una caja fuerte en el CECADER.[75]

24. Durante el periodo auditado la señora Lassalle López no estuvo nombrada, formalmente, por el Departamento de Hacienda como recaudadora auxiliar.[76]

25. El 3 de agosto de 2018, la señora Lassalle López le mostró al señor Toledo Rosa varias *solicitudes de uso,* recibos y facturas de compras de materiales. El auditor le solicitó a la señora Lassalle López que le entregara los originales de las mencionadas *solicitudes de uso,* recibos y facturas, por lo que esta última le entregó dichos documentos junto con una *Hoja de Trámite.*[77]

26. El 6 de agosto de 2018, el querellado se personó a la Oficina de Auditoría Interna del DRD en San Juan y le solicitó al señor Toledo Rosa que le devolviera los originales de las *solicitudes de uso* junto con los recibos y facturas de las compras realizadas con fondos recaudados en el CECADER. El señor Toledo Rosa le indicó al señor López Martiz que no le podía entregar lo

---

[70] Testimonio de la señora Hernández Varela.

[71] *Exhibit* 7 de las partes, Minuta C-6: *Reunión* con la Hon. Adriana Sánchez Parés, secretaria del DRD.

[72] Testimonio del señor Toledo Rosa; *Exhibit* 7 de las partes, Minuta C-1: *Visita a la Región Noroeste (CECADER).*

[73] *Id.*

[74] Testimonio del señor Toledo Rosa. Refiérase, además, al *Exhibit* 7 de las partes. Específicamente la Minuta C-1: *Visita a la Región Noroeste (CECADER), y* la hoja de trabajo E-1: *Certificado de efectivo en caja recaudador auxiliar* del 3 de agosto de 2018.

[75] *Id.*

[76] Testimonios del señor Rivera Pedraza y del señor Toledo Rosa. Véase, también, el *Exhibit 7* de las partes, Minuta *C-1: Visita a la Región Noroeste (CECADER).*

[77] Testimonio del señor Toledo Rosa; *Exhibit* 7 de las partes, Minuta C-1: *Visita a la Región Noroeste (CECADER).* Véase también el primer grupo de documentos del *Exhibit* 8 de las partes.

solicitado debido a que no había evaluado los documentos y no los había copiado. El auditor le aseveró al querellado que se comunicaría con él posteriormente para coordinar la fecha en que se entregarían los documentos originales. No obstante, el señor López Martiz le dijo al señor Toledo Rosa que enviaría a un empleado a recoger los documentos el próximo día, 7 de agosto de 2018.[78]

27. El 7 de agosto de 2018, en cumplimiento con las instrucciones que le impartió el señor López Martiz, la señora Lassalle López fue a la oficina del señor Toledo Rosa a recoger las *solicitudes de uso*, las facturas y recibos de las compras que ella le había entregado al auditor el 3 de agosto de 2018. El señor Toledo Rosa le indicó a la señora Lassalle López que le había dicho al querellado que no enviara a nadie porque no había copiado los documentos y que él coordinaría la entrega de estos al señor López Martiz.[79]

28. En dicha conversación del 7 de agosto de 2018, el señor Toledo Rosa le sugirió a la señora Lassalle López que visitara al director de la Oficina de Finanzas de DRD, señor Rivera Pedraza, para pedir un libro de recibos oficiales y que la nombraran recaudadora auxiliar.[80]

29. El 7 de agosto de 2018, la señora Lassalle López fue a la oficina del señor Rivera Pedraza, director de Finanzas del DRD, y le pidió un libro de recibos oficiales.[81] El señor Rivera Pedraza llamó al señor Toledo Rosa y le dijo que la señora Lassalle López estaba en su oficina pidiendo un libro de recibos oficiales. En ese momento, el auditor decidió "bajar" a la oficina del señor Rivera Pedraza.[82] El señor Rivera Pedraza le dijo al señor Toledo Rosa que no podía entregarle un libro de recibos a la señora Lassalle López porque no estaba nombrada como recaudadora auxiliar. A esta fecha, la señora Lassalle López no tenía un nombramiento como recaudadora auxiliar.[83]

30. El señor Rivera Pedraza estaba bajo la impresión de que en el CECADER no se estaba recaudando.[84]

31. En algún momento, después del 7 de agosto de 2018, la señora Lassalle López fue nombrada recaudadora auxiliar.[85]

32. El 21 de septiembre de 2018, el señor Toledo Rosa visitó, nuevamente, el CECADER. Entre otros asuntos, el auditor entregó copias de las *solicitudes de uso* y los

---

[78] Testimonio del señor Toledo Rosa. Véase también *Exhibit* 7 de las partes, específicamente la minuta C-3: *Reunión del 6 de agosto de 2018 con el señor López Martiz.*

[79] Testimonio del señor Toledo Rosa. Véase también *Exhibit* 7 de las partes, específicamente la minuta C-4: *Visita de la Sra. Amarilys Lassalle López al DRD el 7 de agosto de 2018.*

[80] *Id.*

[81] Testimonio del señor Rivera Pedraza.

[82] Testimonio del señor Toledo Rosa.

[83] Testimonios del señor Rivera Pedraza y el señor Toledo Rosa.

[84] *Id.*

[85] *Exhibit* 4 de las partes.

originales de las facturas y recibos que le entregaron el 3 de agosto de 2018.[86]

33. El 19 de diciembre de 2018, el señor Toledo Rosa emitió el *Informe Monitoría, M-DRD-2019-01 sobre la evaluación de los procesos de recaudaciones complejo de* CECADER - *Aguadilla* (Informe de Monitoría). El periodo de auditoría de este documento comprendió desde el 1 de enero de 2017 hasta el 22 de agosto de 2018.[87]

34. En el *Informe de Monitoría,* el señor Toledo Rosa concluyó, en lo pertinente a la presente controversia, que: 1. Los fondos en efectivo recaudados durante el periodo auditado no fueron depositados en la cuenta bancaria correspondiente; 2. Uso indebido de fondos recaudados en el CECADER; y 3. Ausencia de cobro por concepto de uso de facilidades en el CECADER.[88]

. . . .

### C. Determinaciones de hecho relacionadas con la segunda situación.

43. El 30 de mayo de 2017, el Sr. Adolfo Castillo Vélez, del "Depto. Educación SKILLS USA, ASOC. PR", firmó una *Solicitud de Uso* para requerir hospedaje para 70 personas para un "ADIESTRAMIENTO DELEGACIÓN NACIONAL PR" desde el 30 de mayo hasta el 2 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y se dejaron en blanco las áreas sobre el "canon de arrendamiento" y "Pago total canon". Esta *Solicitud de Uso,* también, está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López y un "Hold Harmless Agreement" y otros documentos relacionados de la póliza número 0504200015 de Eastern America Ins. Agency, Inc. en donde el Departamento de Educación libera de responsabilidad al CECADER.[89]

44. El 5 de junio de 2017, la Agro. Noemí Ramírez Ramírez, de "FUTUROS AGRICULTORES DE AMERICA", firmó una *Solicitud de Uso* para pedir hospedaje para 10 personas en 3 habitaciones para un "ADIESTRAMIENTO" del 11 al 14 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y se dejaron en blanco las áreas sobre el "Canon de arrendamiento" y "Pago total canon". Esta *Solicitud de Uso* también está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por la solicitante y una carta del 24 de abril de 2017, de parte de la señora Ramírez Ramírez y dirigida al querellado, en la que solicitó, entre otras cosas, 2 habitaciones.[90]

---

[86] *Exhibit* 7 de las partes, Minuta C-10: *Segunda visita a la Región Noroeste (CECADER).*
[87] *Exhibit* 7 de las partes, a la página 4 del *Informe de Monitoría.*
[88] *Exhibit* 7 de las partes, A-1: *Carta de Entrega del Informe a la Secretaria del DRD.*
[89] Refiérase al *Exhibit* 8 de las partes.
[90] *Id.*

45. El 6 de junio de 2017, la Sra. Lissette Ríos firmó una *Solicitud de Uso* para requerir hospedaje para 30 personas para una "COMPETENCIA EST. CABA" del 6 al 9 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el señor López Martiz y la señora Lassalle López. Junto con *esta Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por la solicitante y la señora Lassalle López.[91]

46. El 6 de junio de 2017, el sargento Rosa Colón, de la "GUARDIA NACIONAL", firmó una *Solicitud de Uso* para pedir hospedaje para 100 personas del 7 al 14 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". La *Solicitud de Uso* también está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[92]

47. El 8 de junio de 2017, el "Sr. Pedro Enrique", de los "BOYS SCOUTS", firmó una *Solicitud de Uso* para requerir hospedaje para 50 personas del 12 al 15 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total Canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el señor López Martiz y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[93]

48. El 8 de junio de 2017, el Sr. Alberto González, de los "GALLITOS DE ISABELA (BALONCESTO)", firmó una *Solicitud de Uso* para requerir hospedaje en 8 habitaciones del 15 al 18 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[94]

49. El 13 de junio de 2017, el Sr. Carlos Vélez, de "BOXEO INTERNACIONAL", firmó una *Solicitud de Uso* para pedir hospedaje para 9 personas en 3 habitaciones para una "CARTELERA DE BOXEO INTERNACIONAL" del 16 al 20 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el señor López

---

[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*

Martiz y la señora Lassalle López. Junto con *esta Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[95]

50. El 14 de junio de 2017, el "Sr. Walas Colmenares", de la "FEDERACIÓN DE NATACI[Ó]N DE PUERTO RICO", firmó una *Solicitud de Uso* para requerir hospedaje para 30 personas en 4 habitaciones para una actividad de la "FEDERACIÓN DE NATACI[Ó]N" del 23 al 25 de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[96]

51. El 15 de junio de 2017, el Sr. Pablo Rivera, de la "LIGA DE PELOTA", firmó una *Solicitud de Uso* para pedir hospedaje en 10 habitaciones del 27 de junio al 10 de julio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "0". Esta *Solicitud de Uso* también está firmada por el señor López Martiz y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[97]

52. El 22 de junio de 2017, la Sra. Carmen León firmó una *Solicitud de Uso* para un "COMPARTIR FAMILIAR" del 30 de junio al 4 de julio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por la solicitante y la señora Lassalle López que indica que se utilizarán las instalaciones como "HOSPEDAJE". Además, este grupo de documentos incluye un papel que lee "ACUERDO COLABORATIVO MATERIALES DE (CECADER)", que indica que se recibieron 12 unidades de aceite para motor de 2 ciclos. También, hay un recibo de compra de dichas unidades de aceite de la tienda AutoZone en Cabo Rojo, Puerto Rico.[98]

53. El 22 de junio de 2017,[99] el Sr. Ramón L. Meléndez firmó una *Solicitud de Uso* para requerir hospedaje en 34 habitaciones para el "6TO TORNEO SOFTBALL FEMENINO AGUADILLA PR" del 4 al 6 de agosto de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está

---

[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] El documento también exhibe la fecha del 3 de agosto de 2017.

firmada por el señor López Martiz y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López. Además, hay un original del afiche informativo del torneo de softball femenino y una carta del señor Meléndez dirigida al secretario del DRD o al querellado, en la que solicita hospedaje en el CECADER.[100]

54. El 23 de junio de 2017, la Sra. Janeliz Rivera, de la "DELEGACI[Ó]N DE ATLETISMO", firmó una *Solicitud de Uso* para pedir hospedaje del 23 al *25* de junio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el querellado y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por la solicitante y la señora Lassalle López. También hay un papel con el logo del DRD que lee "INVENTARIO DE MATERIALES DE LIMPIEZA (CECADER)", que indica que, el 25 de junio de 2017, la señora Lassalle López recibió, de la solicitante, materiales de limpieza. El documento también indica: "ESTE ACUERDO DE INTERCAMBIO ES POR EL USO DE HOSPEDAJE y piscina. DELEGACIÓN DE ATLETISMO".[101]

55. El 7 de julio de 2017, el Sr. Luis Angueira, de los "BOYS SCOUT", firmó una *Solicitud de Uso* para requerir hospedaje para 20 personas del 7 al 9 de julio de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* no está firmada por ningún funcionario del DRD. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante. También hay un endoso a CECADER en la póliza de seguro del Concilio de Puerto Rico de la organización "Boy Scouts of America".[102]

56. El 27 de julio de 2017, la Sra. Netsybe González Ventura, del "PROGRAMA VENTURING (BSA)", firmó una *Solicitud de Uso* para pedir 8 habitaciones para 64 personas del 25 al 27 de agosto de 2017. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$00.00". Esta *Solicitud de Uso* también está firmada por el señor López Martiz y la señora Lassalle López. Junto con esta *Solicitud de Uso* hay una pequeña hoja de papel con anotaciones a manuscrito que leen: "$640.00", "(8) hab.", "Piscina", "Salón de oficina", "gratis" y "25 al 28 de agosto de 2017". También, hay un formulario de *Relevo de Responsabilidad* firmado por la solicitante y la señora Lassalle López. Además, hay una carta del 27 de julio de 2017, en la que la señora González Ventura solicitó, entre otras cosas, hospedaje

---

[100] Véase el *Exhibit* 8 de las partes.
[101] *Id.*
[102] *Id.*

gratuito. Dicha misiva tiene varias anotaciones a manuscrito, entre las que destacan las siguientes: "$640.00", "gratis" y "Hector Torre Trabaja con Maricarmen".[103]

57. El 4 de abril de 2018, el Sr. Luis A. Luciano Ramos completó una *Solicitud de Uso* para requerir 6 habitaciones regulares y 2 habitaciones VIP del 25 al 30 de abril de 2018. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada", hay una anotación a manuscrito que lee "Se le hizo descuento", se estableció como "Canon de arrendamiento" la cantidad de "$1,800.00", la cual aparece tachada en bolígrafo azul y el "Pago total canon" indica "$1,020.00". Esta *Solicitud de Uso* también está firmada por el querellado. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[104]

58. El mismo 4 de abril de 2018, el señor Luciano Ramos completó otra *Solicitud de Uso* para pedir 6 habitaciones regulares y 2 habitaciones VIP del 30 de mayo al 4 de junio de 2018. En el área que indica las fechas en que se solicita el hospedaje, hay una anotación a manuscrito que lee: "6 junio al 11 junio". En el área del formulario reservada para uso oficial tiene una anotación a manuscrito que lee "Se le hi[z]o Descuento", se clasificó la actividad como una "Privada", se estableció como "Canon de arrendamiento" la cantidad de "$1,800.00", la cual aparece tachada en bolígrafo azul, y "Pago total canon" indica "$500.00". Esta *Solicitud de Uso* también está firmada por el señor López Martiz. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[105]

59. El 20 de junio de 2018, el "Sr. Pedro Enrique", de los "BOYS SCOUT", firmó una *Solicitud de Uso* para requerir hospedaje para 50 personas del 18 al 21 de junio de 2018. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* también está firmada por el querellado. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.[106]

60. Las ocasiones en que no se cobró o se hicieron descuentos en el canon de arrendamiento de los apartamentos del CECADER durante el periodo auditado fueron aprobados por el querellado.[107]

61. Las veces en que se realizó un intercambio de materiales por la estadía en los apartamentos del CECADER durante el periodo auditado fueron aprobados por el querellado.[108]

---

[103] *Id.*
[104] *Exhibit* 8 estipulado por las partes.
[105] *Id.*
[106] *Id.*
[107] Testimonio de la señora Lassalle López.
[108] *Id.*

62. Algunos de los acuerdos colaborativos que se realizaron durante el periodo auditado se hicieron por escrito y otros no.[109]

En resumen, de dichas determinaciones de hechos se desprende, que el CECADER es una de las facilidades que componen la región noroeste del DRD y están ubicadas en la base Ramey en Aguadilla. Cuenta con apartamentos, salones de actividades, piscinas y otras facilidades disponibles para el uso del público en general mediante arrendamiento. A la fecha de los hechos, en el CECADER había habitaciones regulares, que acomodaban hasta 8 personas, y habitaciones "VIP", en las que cabían 6 personas. Las habitaciones regulares se arrendaban a un costo de $40.00 la noche, mientras que las habitaciones "VIP" costaban $60.00 la noche.

El señor López Martiz ocupó el puesto de Director Regional de la Región Noroeste del DRD desde el 3 de febrero de 2017 hasta el 8 de junio 2021. Era responsable de supervisar, coordinar y evaluar directamente el trabajo de los empleados de dicha Región. Además, dirigía, coordinaba, planificaba y supervisaba las actividades administrativas, operacionales y técnicas asignadas la Oficina Regional bajo su responsabilidad. Como parte de sus funciones, tenía que asegurarse del cumplimiento de los procedimientos que rigen los servicios que presta la Región a la cual estaba asignado.

La Sra. Amarilis Lassalle López, Auxiliar de Sistema de Oficina I, laboró bajo la supervisión del señor López Martiz en el CECADER. Como parte de los procesos que se realizaban para el arrendamiento de los apartamentos con los que contaba el Centro, los solicitantes llenaban una Solicitud de Uso, entre otros documentos. La señora Lassalle López se encargaba de dar apoyo en tales tareas y de orientar a los interesados, pero era el señor López Martiz quien

---

[109] *Id.*

autorizaba el arrendamiento y establecía la fianza y los cánones correspondientes que el solicitante debía pagar.

El 3 de agosto de 2018, el Sr. Alfredo E. Toledo Rosa, entonces Auditor del DRD, comenzó una evaluación de los procesos de recaudaciones del CECADER, la cual comprendía el período del 1 de enero de 2017 al 22 de agosto de 2018, sobre la cual emitió el Informe Monitoria M-DRD2O19O1. En el referido Informe, el señor Toledo Rosa concluyó, entre otras, que: 1) Los fondos en efectivo recaudados durante el periodo auditado no fueron depositados en la cuenta bancaria correspondiente; 2) uso indebido de fondos recaudados en el CECADER; 3) ausencia de cobro por concepto de uso de facilidades en el CECADER; y 4) ausencia de reglamentación y controles para establecer los procesos de reservación de arrendamiento de facilidades.

De manera que, de la evidencia que obra en el expediente podemos colegir, que, en cuanto al **primer elemento** del Art. 4.2 (b) de la LOOEG,[110] no existe controversia en que el señor López Martiz era el Director Regional, clasificado como servidor público, según lo define el Art. 1.2(gg) de la LOOEG.[111] También se estableció mediante prueba clara, robusta y convincente, que el señor López Martiz actuó en el marco de los deberes y facultades de su cargo de Director Regional, cumpliéndose el **segundo elemento** de la violación ética.

Sobre el **tercer elemento**, la prueba demostró que, fue el señor López Martiz quien autorizó el uso de las instalaciones de propiedad pública -CECADER-, a terceros -personas privadas- y lo hizo sin la autorización de las personas que ocuparon la Secretaría del DRD desde diciembre de 2016 hasta enero de 2018, la Sra.

---

[110] 3 LPRA § 1857a.
[111] 3 LPRA § 1854.

Adriana Sánchez Parés y el Sr. Andrés W. Volmar Méndez, respectivamente.

La prueba demostró y así lo halló probado el Oficial Examinador, que el señor López Martiz, en contravención al *Reglamento de Arrendamiento*, firmó varias *Solicitudes de Uso* para el arrendamiento de las instalaciones del CECADER en las que autorizó que se realizaran descuentos o se eximiera del pago a las personas que interesaban utilizarlas. El expediente administrativo contiene una serie de documentos que evidencian dichas actuaciones. Entre estos, figuran un documento titulado *Uso gratuito de las instalaciones de CECADER*. Según este, el 20 de junio de 2018, el "Sr. Pedro Enrique", en representación de los "BOYS SCOUT", firmó una *Solicitud de Uso* para requerir hospedaje para cincuenta (50) personas en el CECADER, del 18 al 21 de junio de 2018. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada" y las áreas sobre el "Canon de arrendamiento" y "Pago total canon" indican "$0". Esta *Solicitud de Uso* está autorizada y firmada por el señor López Martiz. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.

Otra evidencia consistió en el documento de *Descuentos en el canon de arrendamiento para el uso de las instalaciones del CECADER*. De este surge que el 4 de abril de 2018, el Sr. Luis A. Luciano Ramos completó una *Solicitud de Uso* para pedir seis (6) habitaciones regulares y dos (2) habitaciones "VIP" en el CECADER, del 30 de mayo al 4 de junio de 2018. En el área que indica las fechas en que se solicita el hospedaje, hay una anotación a manuscrito que lee: "6 junio al 11 junio". En el área del formulario reservada para uso oficial tiene una anotación a manuscrito que lee "Se le hi[z]o Descuento", se clasificó la actividad como una "Privada",

se estableció como "Canon de arrendamiento" la cantidad de "$1,800.00", la cual aparece tachada en bolígrafo azul, y "Pago total canon" indica "$500.00". Esta *Solicitud de Uso* también está autorizada y firmada por el señor López Martiz. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lasalle López.

El 4 de abril de 2018, el señor Luciano Ramos completó otra *Solicitud de Uso* para requerir seis (6) habitaciones regulares y dos (2) habitaciones "VIP" en el CECADER, del 25 al 30 de abril de 2018. En el área del formulario reservada para uso oficial se clasificó la actividad como una "Privada", hay una anotación a manuscrito que lee "Se le hizo descuento", se estableció como "Canon de arrendamiento" la cantidad de "$1,800.00", la cual aparece tachada en bolígrafo azul y el "Pago total canon" indica "$1,020.00". Esta *Solicitud de Uso* también está autorizada y firmada por el señor López Martiz. Junto con esta *Solicitud de Uso* hay un formulario de *Relevo de Responsabilidad* firmado por el solicitante y la señora Lassalle López.

Finalmente, igual se configuró el **cuarto elemento** constitutivo, pues al beneficiar a terceros con el uso de las instalaciones sin que pagaran los cánones de arrendamiento correspondientes, constituyó un beneficio no permitido por ley. Respecto a este elemento, la *Ley para Autorizar el Uso Gratuito de las Instalaciones Recreativas Gubernamentales a los Concilios de Puerto Rico de los "Boys Scouts" o "Girls Scouts America"*, en su Art. 1,[112] excluye de su aplicación a las facilidades de alojamiento que generen ingresos a las agencias, como lo es el CECADER. Es decir, la Ley no permite ceder a dichas entidades, libre de costo, el alojamiento en el CECADER. Tampoco permite conceder descuentos

---

[112] 15 LPRA § 565 Inciso (a).

en el canon de arrendamiento, por la utilización de las aludidas instalaciones, actuación que realizó en dos ocasiones el señor Lopez Martiz a favor del señor Luciano Ramos.

Aun cuando aceptáramos, según arguye el señor López Martiz, que las limitaciones de la Ley admiten llegar a acuerdos colaborativos que autorizaran el alojamiento gratuito o con descuento en los apartamentos del CECADER, lo cierto es que este no produjo ni se encontró en el DRD acuerdo colaborativo alguno relacionados con el CECADER.

El señor López Martiz estaba obligado por el *Reglamento de Arrendamiento* a cobrar cánones de arrendamiento y fianza por el uso de las instalaciones del CECADER, aun a las organizaciones de niños y niñas escuchas. Los descuentos que concedió para el uso de las instalaciones del CECADER o su uso gratuito, no estaban autorizados ni por ley ni reglamento. Como tal, constituyó un beneficio no permitido por ley.

En conclusión, se configuraron todos los elementos del inciso (b) del Art. 4.2 de la LOOEG.[113] Existe prueba clara, robusta y convincente en el expediente administrativo que avala tal conclusión.

En cuanto la violación del Art. 4.2 (r) de la LOOEG,[114] tenemos que sus elementos son: 1) que se trate de un servidor público; 2) que omite el cumplimiento de un deber impuesto por ley o reglamento; y 3) que con ello ocasione la pérdida de fondos públicos o produce daños a la propiedad pública.

Hemos dicho, que el señor López Martiz era un servidor público a la fecha de los hechos imputados, lo que cumple con el primer elemento de esta disposición. Sobre el segundo elemento, también se demostró que el señor López Martiz, como Director

---

[113] 3 LPRA § 1857a.
[114] *Id.*

Regional del DRD, incumplió con el deber que le imponía el *Reglamento de Arrendamiento* del DRD de cobrar los cánones de arrendamiento correspondientes, y cobrar la fianza requerida. Tales omisiones provocaron que los fondos públicos correspondientes a los cánones de arrendamiento -$2,920.00-[115] se perdieran al no ingresar a las arcas del DRD.

El *Reglamento de Arrendamiento* del DRD, detalla en su capítulo V el proceso para arrendar las instalaciones del DRD, como lo es el CECADER. En su Art. 5.04, dispone que el Administrador o Director Regional concederá el permiso de arrendamiento una vez obtenga la evidencia de pago y de todos los documentos requeridos. Por su parte, los Art. 6.00, 6.01 y 6.02 de dicho cuerpo reglamentario, disponen la forma en que se establece el canon de arrendamiento para cada instalación. Además, las concesiones realizadas por el señor López Martiz al ofrecer descuento o gratuitamente el alojamiento en el CECADER, no cumple con los requisitos establecidos en el Art. 9.00 de dicho Reglamento para autorizar actividades libres de costo.

De manera que, la prueba clara, robusta y convincente que obra en el expediente administrativo del caso nos lleva a concluir que en efecto el señor López Martiz violó el Art. 4.2 (r) de la LOOEG.[116]

En fin, el procedimiento administrativo llevado en contra del señor López Martiz demostró con prueba clara, robusta y convincente que este, como Director Regional del DRD, autorizó que terceros utilizaran las instalaciones del CECADER de manera

---

[115] En el caso particular del CECADER, al momento de los hechos, las habitaciones regulares se arrendaban a un costo de $40.00 la noche, mientras que las habitaciones "VIP" costaban $60.00 la noche. El señor López Martiz concedió descuentos en los cánones de arrendamiento de apartamentos en el CECADER a favor de señor Luciano Ramos en dos ocasiones, ascendentes a $2,080.00. Al permitir el alojamiento gratuito de 50 personas relacionadas con la *Solicitud de Uso* de los "Boys Scout", el DRD dejó de recibir en sus arcas $840.00.
[116] 3 LPRA § 1857a.

gratuita y que estas acciones en contravención a sus obligaciones como Director Regional no permitidas en ley, conllevaron a la pérdida de fondos públicos.

**V**

Por los fundamentos antes expuestos, se *confirma* el dictamen recurrido.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones